3-0-9-0-5-0-0 People of the State of Illinois at the League, Erica Minovic v. Corey Wallace, Appellant Emily Eisner. You may proceed. Thank you, Your Honor. Good morning, Your Honors. Good morning. I'm Emily Eisner, counsel for Appellant Corey Wallace. May it please the Court. The first set of error in this case is the use of the canine, which denied my client a fair trial. What happened was the jury was impermissibly told by way of the dog handler on the witness stand and the prosecutor in closing argument that the canine's tracking abilities and the path that the canine pursued were a key in solving the puzzle on the elements of the crimes. As Your Honors know, there is a ban for canine evidence at trial before a jury because a canine overpersuades a jury of its reliability and at the same time is not reliable and cannot be cross-examined. In particular, the ban is so clear that failure to object or make a motion to eliminate is its own category of ineffective assistance of counsel under the Lefker case. This is a forfeiture issue, isn't it? There is an issue as to what the standard of review is based on a forfeiture. And so the way to be analyzing this is under Strickland and the two prongs of that and also under the plain error doctrine, either one of those, which is the closely balanced test and there's also a structural error issue, which this Court does not have to reach if it reaches under the first. So there was no excuse for one to not exclude this evidence when the evidence has been banned for nearly 100 years. Now, the prejudice under the forfeiture. Under the plain error doctrine. Correct. There's a forfeiture issue. You're not under the closely balanced test, are you? Oh, yes. You'll be under the second prong. Oh, absolutely under the closely balanced test. The closely balanced test is probably the path of least resistance because this was a case where, if anything, there was overwhelming evidence in the other direction. In view of the first fact that I would cite to your honors is that the main alleged eyewitness had been impeached with her prior statement of uncertainty and also with her need for eyeglasses, which was something that troubled the jury. In view of the fact that there was a slew of witnesses, including the occupants in the car that did not identify my client and a defense witness who saw clearly that it was not him. And in view of the Nextel Sprint customer service records, that was actually an estate exhibit at first, and it inadvertently to the state's chagrin created, presented, and corroborated an alibi for our client. So the state, in addition, because of the over-persuasive power of this canine, also needed and relied on the error of allowing this dog's path to explain how it was that a weapon was not found. And that was another major weakness of the case, that a weapon was not found, but the path of the jury, excuse me, of the canine enabled the state to explain how this path that the canine was going on through, going north, going through grassy lots, going through a parking area, and particularly going back, going past 817 Robin Lane and the shed, which is the shed that the state was trying to connect. So the canine became this over-persuasive factor on what was a weak case. And to hammer the error home, the prosecutor used the canine to say how it all fits. It led directly to my client. Again, over-persuasive, inadmissible. It should never have come in. And, Your Honors, without the canine, the state's case consisted of the elements of the weapon and the elements of identity was built on, and this is really sort of the conclusion as to what I'm saying here, on contradicted testimony, on innuendo. And hearsay, as Your Honors can also see from the other error, so the canine added to the cumulative error in addition to over-persuading the jury on its own. Turning to the second issue, which is the inadmissibility of the gunshot residue exhibit, because the state did not make a prima facie case that it came from my client. All the state established at the hearing on counsel's objection and at trial was that Officer Jackson performed a swabbing for the presence and absence of the residue shortly after the crime, but then he testified that he was unable to mark the exhibit with a timely inventory number. So when exhibit number 61 was opened and presented in court, there was no reasonable means to identify it. Neither Officer Jackson nor any other witness identified it by inventory number, by any kind of continuing set of initials by Officer Jackson and initialization, names and dates, distinctive marking, handwriting. The Howard case instructs that an inventory number is not only the preferred way to lay a foundation for a fungible item and the chain of custody for that. But was necessary because, like in Howard, this was a fungible specimen that would have been in multiple places and of multiple commonplaces and with other such exhibits. And here it was over a period of one and a half years, including a desk drawer, a temporary locker, a vault, and then the crime lab, plus the transit in between. But the Illinois Supreme Court doesn't require the kind of chain of custody that you're suggesting. Yes, it does. Because there has to be the inventory number. There has to be protective measures. Because if they don't, and this is, and if they don't take, if there isn't testimony to say that there were protective measures taken. And in this case, the only testimony there was, was that the desk drawer was locked. So there was testimony on that first part. But then, without an inventory number, there's no way to track it. And there was no other testimony as to what happened and where it was. There was testimony as to where it should have been. But without that inventory number or some other way to say this is the same exhibit, we have unaccounted for gaps in that chain of custody. And without any safekeeping as to those, and to know where it was and what it was doing, because there was no way to track it, there was no sufficient completeness to avert the real possibility of substitution of this exhibit. And, Your Honor, there was evidence of substitution. Because the item that appeared to be taken from one hand had morphed into two hands by the time of the testing. But, you know, the testing in August, there was testimony that the original seal was still intact. All the seal says, and there were seals in the Gibson, Hayes, and Howard, all the seal says is that that particular exhibit was tested, was not contaminated at best. But it doesn't say whose it was. And that's the problem here, is that we don't know whose it was. And then, to add to the fact that it had sort of changed, I mean, that that particular exhibit was not contaminated, but it didn't belong to my client. That's the problem. So the seal doesn't really help. And as a result, all of this, and because that it doesn't tell you that, the burden does not shift to the defendant to say, well, how did it commingle and what happened and was it inadvertent or was it purposeful. The burden doesn't shift because there was nothing to show to identify whose specimen it was. So, as a result, all of this expert testimony, because it could have belonged to somebody else, and that's the problem of that not letting you describe a basic case. So all of the expert testimony and then the jail conversation about the residue were reversible error and must be suppressed on retrial. The last set of errors that I will argue today are issues number 5B and D, which are the tortured relevance and prejudice of the taped conversations from the jail. The jail conversations were inadmissible because this was, they were a circus and a sideshow of my client's preparation for trial from the jail, of his figuring out pre-trial discovery and assessing the pros and cons and weaknesses and strengths and details of the case for and against him with his mother and his lawyer, occurring, many of them, over two years after his arrest, which was not a matter for the jury. There were no admissions on the tapes and no witness tampering, but the tapes became an excuse for the prosecutor to make argument after argument about how guilty people talk and act, about how guilty people talk to their mothers, their unsuspecting mothers and family, a mother who believes in his innocence and is helping his lawyer investigate his case. So it's all about how my client was accordingly lying to his old mother, and that's what the state was doing. The tapes were terribly confusing, and you have to strain to try to understand the tapes and the transcripts. There's nicknames and pronouns and words and jargon and foul language and jail noise and talking fast and talking over each other, which gave the state free reign to make up its own relevance by taking simple words like help and need and truth and even the word on and redefining them to turn protestations of innocence and babble into a guilty mind. And as your honors can see, the prosecutor was doing this scores and scores of times. The prosecutor changed the line. He knows it's on me on the tape as if my client said he knows it's me. On the tape, my client said, I have a lot to say without saying it. And then because the tapes were so confusing, the prosecutor made it up. The prosecutor quoted my client saying right, right as if he had confessed, all because the tapes had no relevance and were practically incoherent to begin with. The pages and pages of testimony and procedures and strategizing and irrelevant jail talk that were objectively impossible to understand, but the prosecutor used them to attack my client's character when my client, who did not testify, never put his character or his credibility in issue. Last on these, these jail conversations were not only rambling, but they were replete with hearsay from non-testifying declarants, from my client's non-testifying mother. For example, that the witness, Tamisha, was nervous, that Tamisha did not know what to say. And then to the jury, the prosecutor argued the truth of the matter, asserted that, yes, indeed, Tamisha had been nervous out of court. And if she had known what to say, she would, if she had been telling the truth, she would have known what to say. In conclusion on this issue, the length of the tapes was extraordinary for the jury. Over one hour in court time that covered 10 months of smoke and mirrors and collateral prejudice that is amply pointed out in the briefs, that could not possibly be navigated by this jury without the prosecutor translating them. I urge your honors to appreciate how incoherent they were and that they had no purpose for being presented other than to deny my client a fair trial. We respectfully request, if there are no further questions, that your honors reverse and remand for a new trial, or reverse the convictions outright, or order sentencing relief for the reasons stated in the briefs. Thank you, Counsel. Thank you. I'm not sure you can read the sheet. May it please the Court, Counsel. I'm going to take and focus primarily on the first issue this morning. If I have time left, I will address the gunshot residue. But without hounding evidence. The first, I guess I want to get one thing out of the way first of all, I guess the standard of review in this case. The reason why I did not argue in my brief anything with respect to ineffective assistance of counsel, is because under forfeiture rule, since defendant hasn't properly preserved the issue, we have to address the question as a matter of plain error. If defendant had objected, the argument obviously would be harmless error. There is case law out there that provides that the erroneous submission of bloodhound evidence can be harmless error. So, I guess as I analyze the situation, the question here under plain error is, was there error? Second of all, was it plain? Then thirdly, if it was plain, should the forfeiture be excused? At which point we have to determine whether or not the evidence is closely balanced, or whether or not the error affected the fairness of the trial and challenged the integrity of the judicial process. While going through all that, we're going to address the issue of plain error. We're going to address whether or not it's plain, which in question is whether it's reversible. And then if we get down to the fact that is the evidence closely balanced, etc., basically what we're going to be doing is we're going to be finding that if this is not plain error, even though it's error, it's not plain and it's forfeited, then the fact that defense counsel didn't raise it, there can't be any prejudice simply because of the fact that the error would otherwise be harmless. So, that's the reason why I basically eschewed any kind of argument concerning ineffective assistance, because if this court, first of all, finds it to be plain error and finds it to be reversible and applies a plain error and forfeiture is not applied, this court is going to reverse. Whether or not defense counsel was or wasn't ineffective, this court is going to reverse. So, as I see it, the entire issue here in the standard review is simply one of plain error. Now, in having said that, I guess the first question is, was the admission of the bloodhound evidence error? Yes. Case law makes it clear that the admission of bloodhound evidence is error. The question is, the second question, and what I'm doing here is I'm following the plain error analysis of People v. Naylor of the Illinois Supreme Court, because I think it provides the best outline of how plain error analysis should go. And the next question is, basically, is the error plain? That is, is it reversible error? Because as we all know, while all plain error is reversible, not all reversible error is plain. So, the question that we have to take and answer ourselves here is, is this reversible error? And I guess for me to answer that, I basically undertake a harmless error analysis, because under the law, the erroneous admission of bloodhound evidence is harmless as long as other properly admitted evidence establishes the same facts or the same elements of the crime sought to be proved to the bloodhound testimony. In this case, I analyzed what exactly did this bloodhound evidence prove? Because the evidence established here that with respect to the bloodhound, what we have is this animal will track the most recent scent. It will not backtrack. It will not take and deviate. The most recent path that an individual has taken is the path that the dog will follow. What is the evidence in this case? The evidence in this case is that the shooter came from around 817, 819 Robin Lane, fired into the car, and left. The evidence also is that the defendant was seen emerging minutes later from around 817, 819, walked up to the car, walked up to one side of the car, poked his head in, walked around to the other side of the car, did this, I think, open the door, if not, basically still said something from the outside, then walked back around the same way he had came and the same way that the shooter had emerged and had left. And then was then eventually found and seen behind a building on Roslyn, which we have submitted, the state submitted the diagram for demonstrative purposes, and if you take a look at how everything is, 817, 819 is here, and the Roslyn address is up here. So it's all visible from where the shooting took place, et cetera. Before you get into any more detail, how long has the use of this kind of evidence been banned? Can I just say for a long time? Okay. Because I don't know a specific year. I don't know, at least from 1994, because we have a case. Yeah, okay, I don't know a specific year. Okay. So presumably the prosecutor knew that this was banned evidence. Quite frankly, in a conversation that I had with the prosecutor. Is this part of the record? No, it's not. Can we presume that the prosecutor would have known that something that had been banned for, what did you say, a long time? I don't think we could presume that. Okay. Your argument, as I understand it, is that it's harmless because we didn't need it. As it turns out, in my retrospect and in my analysis of this, yes. Okay. So why would you do it? Now, I'm not you. I understand. Oh, no, no, I understand. I understand. Under the, two reasons. First of all, under the mistaken belief that it was admissible. And secondly, because the prosecutor believed that it proved something other than what it actually proved. And even when the prosecutor eventually made the argument in closing, even he reiterated what I just said here. And basically, I think, caught himself in how the evidence was actually limited. Because while one might try to take and establish the fact that, well, it showed that he took the same path as the perpetrator did. So what? We already know that from the eyewitness who saw the perpetrator emerge and then leave. And then saw the defendant emerge and then leave. So it doesn't really prove anything beyond that. Because what happens is since the dog follows the last track, since the defendant did approach and then did leave the last track. And there was no evidence that the dog did anything with respect to going into or indicating anything with respect to the shed or 817. Which establishes, circumstantially at least, establishes the fact that if the perpetrator had gone back into 817, the dog didn't follow that track. The dog followed the track of the defendant, the last track that he did. And so it corroborates what the handler basically said is all I'm saying. So what it proves is, it simply proves that this is the path that the defendant took after he approached the car, after the shooting had occurred. And of course, my question is, you know, so what? And it really doesn't prove anything, really anything that necessarily is relevant to the case. Other than the fact that this is how, this is where the defendant walked after he approached the car. So your argument is that, yes, it's true that banned testimony, banned evidence was used. But it doesn't matter because it didn't prove anything. Yes, it didn't prove anything, number one. And number two, it didn't prove anything that we did not already establish or could establish through our testimony. I mean, other than the fact that he walked past the building, went up on Roslyn, went into this field. The fact of the matter is, we already know he walked that way. And we already know he was behind Roslyn because the police officer, when he heard people muttering in the crowd about, quote unquote, Choke, being the one that did the shooting, and being aware of who that street they belonged to, looked over and saw the defendant sitting there. Once again, no great revelation. So it's like, unfortunately, the prosecutor thought that the evidence was more significant than it really was, and it really isn't. It really proves nothing. And again, nothing that we can't prove by independent evidence. That's why I say it's harmless. That's why I say if it's harmless, it's not reversible. And therefore, if it's not reversible, it can't be ineffective assistance because counsel can't be ineffective because the defendant really wasn't prejudiced. Why aren't you using the test from the Supreme Court? I mean, is there a case recently that changes the plain air analysis from the two-prong analysis that have been established and say now it's the second prong is a test about? First off, we know in the first prong, if the case is closely balanced, which we argue it's not, if it's closely balanced and there's air, then we reverse it. Plain and simple. Plain and simple. And that has nothing to do with whether it's harmless or not. We reverse it if it's a first prong. If it's a second-prong analysis, then we have to determine whether using the test that the Supreme Court has supplied. Had they started using harmless air analysis in the second prong, I'm not aware of that. I'm not. Okay. I don't mean to confuse you, Your Honor. Okay. And I can see that I have. I don't think I'm confused about this. Well, no, no, you're not confused about the law. You're confused about my argument. Harmless air is coming in with respect to before you even get to applying one of those two prongs, you have to determine whether or not the air is reversible. You have to determine if there's air. You take a substantive look. If you take a look at Naylor, Naylor first said, Naylor was a Montgomery issue. And in Naylor, they first said, was it air? They found that there was air. Then they go on to ask the question, was that air reversible? Because without reversible air, there can be no plain air. And what I'm suggesting here is, in analyzing whether this air is reversible, I'm suggesting that because the air is harmless, but because this evidence doesn't really make any difference, this air, even though it is air, is not reversible air. Therefore, you don't have to go any further in your plain air analysis. That's right. That's with all due respect to you. You're not applying the test the Supreme Court has told us that we're supposed to apply, because if you look at the cases, first off, if there's air, you admit there's air. Sure. And if it's a first prong air, you don't go to this other analysis, whether it's reversible or not. All I can dredge your honor to is Naylor. Well, there are cases in the last year that have come out from the Supreme Court, in the last year, that said once there's air, we don't look to see if it's the degree of air. That's sort of what you're arguing, the degree of air. Well, you know, we don't look at that. Now, if it's a second prong thing, it's a different story. If you take a look at all of the cases stemming back from Herron, even Herron has said unless the air is reversible, there can be no plain air. I mean, simply because you have air doesn't mean that you just go on to take and determine, you know, those two prongs. But it's the two prongs that we use to determine whether it's reversible. No, the two prongs are used. In Naylor, if you take a look at Naylor, the third question they ask is should the forfeiture be honored? And it is in that analysis. You use the two prongs to determine once you determine that there's air, once you determine it's reversible, then you take a look at the two prongs. And the two prongs are then applied to determine whether or not we should honor the forfeiture or not, i.e., because even though it might be plain air, if the case is not closed, or if it's not one of those errors that affect the integrity of the court process, then the forfeiture is honored. That's where the two prongs come in. Counsel, that's two minutes. Thank you. So you're saying that the plain air analysis goes to the harmless air analysis after there's air? I'm not saying, what I'm saying is with respect to the harmless air, because there's no other way for me to take and to suggest that. To make the argument, what I could have done in this case is I could have said that this error is not reversible. And it's not reversible, I could have just left out the harmless error. This error is not reversible because it didn't prove anything. It didn't show anything other than what we already had shown. So the error itself is not a reversible error. Okay? And you would have probably asked me, where did you get that argument from? Well, I got that argument from the case law that deals with the erroneous admission of bloodhound evidence at a trial where the court has found it to be harmless. That's where I'm making the argument. That's where the harmless goes in. I'm not trying to take – I'm not – there's a difference because obviously if it's harmless, it's our burden because it's plain air. It's their burden. I understand that. And I don't want to take and conflate those or confuse those. But in order to make my plain air argument, what I'm saying is while I've got error here, this error is not reversible because this evidence didn't prove anything, didn't prove a factor element, especially since it didn't prove anything that we didn't show by our independent witnesses. If that dog had not been in there, then basically the case would still be the same. That same evidence would be there. And all I can do is – all I can do is direct you to Naylor and the analysis. And the reason why I like Naylor is simply because of how the Supreme Court broke each question down. They broke each question down each time they went through it. And it's nice because I find a lot of times I feel from my end when I have to take and write these things, I feel as though sometimes the courts kind of conflate the analysis too much. And sometimes I think the courts jump to a question before they actually have to get to it. Okay? That's my opinion. And when I saw how Naylor was analyzed, that's where it's all based on. So under your theory, if there's error and if the case is closely balanced, you still might not reverse it because of this other test that you're talking about that's in between? Well, you wouldn't even get to the closely balanced. You wouldn't even have to ask that question or even analyze it to determine whether the evidence was closely balanced or not. That's my point. Because under Herron, like I said, Herron basically says and Piotrkowski, I believe, and there's one other case that escapes the Supreme Court where they simply talk about. Okay? Let me just see if I can summarize what I think the argument is and just tell me right or wrong. That would be fine. By way of example, six people say come in and testify back to X. Okay. It turns out it was plain error to allow one of them to give that testimony. You don't even get to – you don't even – you just say, well, under the Naylor analysis, you've got error. It was error to do this. But it's not – but it wasn't plain error because it wasn't reversible and, therefore, you don't get to the two factors at the end. Is that – Correct. Roughly your argument? Correct. Okay. Thank you, Your Honor. Thank you. The first point is this – Cruz was 1994, but the ban on canine evidence was 1914, so it's almost 100 years. The second point is Strickland. We did raise Strickland. Strickland is in the brief. They chose not to address it. The argument stays intact. They didn't address their Strickland argument. As far as their Naylor point, I think I can explain that quickly. That refers to something where the – it's a collateral, not a material issue. Somebody – there's an error on, like, a leading question or something. It's just so unimportant that who cares? These – the weapon and the identity of the offender are not collateral points. They're the central points in this case. The second one, when he says – he admits it, I think, unwittingly when he says capability of independent proof. It's not – capability doesn't matter. It wasn't independently proved. It's not whether it's capable if they had other evidence, if they had found a gun. It wasn't – it might have been capable, but the capability did not materialize. Let me ask you this. In your opinion, what did the dog evidence prove? What was the dog evidence? It was the – it was the path from the deceased car. It was the scent. It was to and from the deceased car that led directly to the defendant. No other witness was able – every other witness was, I saw something, I didn't see something. The offender was masked. The dog was the only one that could – that could – again, it's unreliable. It should never come in. But the dog, it was the path that – and the path wasn't – the path – the other witnesses, no one else testified even anywhere closely to the path except for Zatella Bridges, which was so confusing that the state had to say in closing argument that I never rehearsed her or pointed out the diagram to her so she doesn't know what she's talking about, basically. That's the woman that had the stroke. Poor woman. But the point being is, is that – and her testimony contradicted everybody else anyway. So the dog, the prosecutor used, whether he was right or wrong, it's over persuasive, told the jury how significant this dog was because the scent, it was the scent that led right to the defendant. And then on the second one, it's the opportunity to jettison the weapon. And no one else could testify to that. So those two points are very important. So the prosecutor used it and argued it to overplay their case in a case where the evidence was had holes and wasn't closely balanced at a minimum. In fact, we've raised reasonable doubt because the evidence was – from our point of view, it wasn't even sufficient to sustain a conviction. Can I ask a factual question? I know that there was evidence that ammunition that was found in the house had been at one time in the same gun. Was that evidence ever tied to the gun? No. And in fact, what happened was the ammunition under the couch, it turns out that it couldn't possibly have come because there were nine expended casings at the scene and the gun under the couch, the pistol magazine was full. So it could not possibly have come from the one under the couch. And then there was some ammunition in the closet, which was extraordinarily common under manufacturer and ballistics markings. And if you read the cross-examination, the examiner backtracked from that and said, you know, you can't really – you cannot tell that an unfired bullet in the closet – we don't know where it went. We don't know what came from there, which is, again, sort of why we have all these other issues of the innuendo of trying to use this borrowed phone, you know, and receipt and all this smoke and mirrors, too,  So the answer to your question is no. It could not be connected. If there are no further questions, thank you. I want to thank both attorneys for their arguments. The court will take this under advisement and render a decision with dispatch. And now we'll take a panel recess.